UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
HAGSHAMA MANHATTAN 10 GOLD, LLC       :
HAGSHAMA MANHATTAN 10 PLATINUM,       :
LLC, and CO FUND 1, LLC,              :
                        Petitioners,   :      1:20-cv-04839-ALC
                                       :      OPINION AND ORDER
        v.                             :
                                       :
CHESKEL STRULOVITZ; 940 FIRST AVENUE,:
LLC and FIRST AVENUE REALTY           :
HOLDINGS, L.P.,                       :
                                       :
                        Respondents.   :
-------------------------------------------------------------x
ANDREW L. CARTER, JR., District Judge:

The Court now considers whether to confirm an Arbitration Award (composed of a Partial

Final Arbitration Award and Final Arbitration Award), as requested by Petitioners Hagshama

Manhattan 10 Gold, LLC, Hagshama Manhattan 10 Platinum, LLC and Co Fund 1, LLC, or to

vacate, as requested by Respondents Cheskel Strulovitz; 940 First Avenue, LLC and First Avenue

Realty Holdings, L.P. For the reasons that follow, the Court hereby CONFIRMS the Arbitration

Award and DENIES the motion to vacate.

## Introduction

This matter arises from a real estate development joint venture between Respondents, a

New York limited liability company, New York limited partnership and an individual New York

resident[1], and Petitioners, Florida limited liability companies operated by Israeli members and

---

[1] "The parties also executed a separate Limited Partnership Agreement that, among other things, (i) designates 940 First A venue LLC as the General Partner and First Avenue Realty Holdings L.P. and the three [Petitioners] as Limited Partners; (ii) sets forth the parties' equity interests; and (iii) attaches as an exhibit and incorporated by reference the [JV] Agreements. Respondent, Cheskel Strulovitz signed the Limited Partnership Agreement as the President of 940 First Avenue LLC and he guaranteed in his individual capacity to the [Petitioners] the obligations of 940 First Avenue LLC, as Promotor, and the Joint Venture Partnership under the [JV] Agreements." ECF No. 1-8 at 2.

affiliates. On June 22, 2015, each of the Petitioners entered into identical joint venture agreements ("JV Agreements") with the Respondents to acquire ownership of real estate located at 940 First Avenue, New York, NY (the "Property" or "Project") for purposes of demolishing the existing four-story building and constructing a new mixed-use condominium complex. The Petitioners collectively invested $5,000,000.00 into the Project, which the Petitioners wired or transferred to the Respondents.

Section 10 of the JV Agreements contains provisions allowing the Petitioners to demand the return of their $5,000,000.00 investment plus an amount representing an Internal Rate of Return ("IRR") or a cumulative annualized 12% return if certain conditions precedent are not obtained. Specifically, if Respondents failed to obtain necessary permits, upon demand Petitioners would be entitled to a projected IRR of 30.5%.[2] If Respondents failed to vacate the property of rent stabilized tenants, on demand Petitioner would be entitled to the cumulative annualized 12% return. The relevant provision of the JV Agreements, Section 10.2, provides:

> (a) *Failure to Obtain Finance or Permits.* Notwithstanding anything to the contrary herein contained, and without derogating from any other provisions of this Agreement, if, within 9 months after the date hereof (*i.e.*, signing), the JV Partnership shall not have obtained the Loan or the Permits - then, (and without derogating from the Investor's rights hereunder), if and when requested thereafter in writing by the Investor, at the sole option and discretion of the Investor - the Investor shall have the right to require the Promoter and/or JV Partnership to buyout the Investor's interest in the JV Partnership and pay the Investor an amount equal to the Investor's Closing Capital Contributions made and still outstanding plus an amount representing a cumulative annualized return of twelve percent (12%) for the Investor on the Investor's Closing Capital Contributions as calculated on such outstanding Closing Capital Contributions from time to time, for the period until date on which Investor shall actually receive the full amount of such payment under this Section 10.2(a).
>
> (b) *Failure to Vacate the Real Estate of the Stabilized Tenant.* Notwithstanding anything to the contrary herein contained, and without derogating from any other provisions of this Agreement, if, (A) by September 30, the Controlled Tenancy shall not

---

[2] The Partial Arbitration Award notes that there is "slight disagreement between the parties as to the percentage of the IRR. The [Petitioners] calculate it to be 30.5% while the Respondents assert the correct figure is 30.39%." ECF No. 1-8 at 3. Because the IRR is not part of the award, the dispute is immaterial.

have been terminated and the Real Estate vacated of the Controlled Tenant, or (B) within three (3) months after the Closing Date, the Stabilized Tenancy shall not have been terminated and the Real Estate vacated of the Stabilized Tenant - then, (and without derogating from the Investor's rights hereunder), if and when requested thereafter in writing by the Investor, at the sole option and discretion of the Investor - the Investor shall have the right to require the Promoter and/or JV Partnership to buyout the Investor's interest in the JV Partnership and pay the Investor an amount equal to the Investor's Closing Capital Contributions made and still outstanding plus an amount representing its IRR under the Business Plan for the period until date on which Investor shall actually receive the full amount of such payment under this Section 10.2(b). If the Investor exercises either of its rights set forth above in (a) or (b) of this Section 10.2, then (i) the Investor shall transfer its membership interest in the JV Partnership to the Promoter upon completion by the Promoter and/or JV Partnership of its payment obligations under this Section 10.2, and thereafter, Investor shall have no further rights in and to and against the JV Partnership, the Promoter and the Principals, and (ii) each of the JV Partnership, the Promoter and the Principals shall have no further rights against the Investor. The Promoter and/or JV Partnership shall have a maximum of a 90 day period from the date of receipt of the Investor notice exercising its rights under this Section 10.2 to complete its payment obligations.

ECF No. 1-1 at 19-20. By September 2015, neither of the conditions had been met.

Petitioners did not exercise their demand right immediately. A few important developments occurred in the Project. In Spring 2016, when approval of the permits as still pending, the Parties learned of a new New York City zoning law that would make it possible to increase the development potential of the project by 4000 square feet. The Parties agreed to withdraw the existing plans awaiting permitting and file new plans with the expanded square footage. In late March or Early April 2016, non-party Namdar Realty Group issued a letter of intent to purchase the property for $9.2 million in case. Hagshama believed the price was too low. Though there was discussion of negotiating a higher offer, nothing concrete materialized. On August 3, 2017, the NYC Division of Housing and Community Renewal, Office of Rent Administration ("DHCR") issued an order in favor of the remaining rent-stabilized tenant, requiring that the tenant be offered a lease. Subsequent attempts to settle with the tenant so they would vacate the apartment failed.

On December 13, 2017, the Petitioners sent a formal written notice to the Respondents demanding the return or "buyout" of the Petitioners' investment plus IRR based on Section 10.2 of the JV Agreements. Respondents refused.

On or about April 18, 2018, Petitioners filed a demand for arbitration with the American Arbitration Association against the Respondents, which was assigned to and handled by the International Centre for Dispute Resolution ("ICDR"), a division of the AAA, because the case involves foreign claimants. On or about June 26, 2018, the AAA appointed Arbitrator Neal M. Eiseman, and afforded the Respondents until July 11, 2018, to object to his appointment. Respondents objected to the appointment of Eiseman, but those objections were denied by the AAA.

During the arbitration, Petitioners asserted that pursuant to Sections 10.2 (a) and (b), they are entitled to the complete return of their capital investments and IRR of 30.5%. However, during the evidentiary hearings, the Petitioners withdrew their claim for IRR and instead sought only the 12% cumulative annualized return. Respondents asserted that Petitioners were entitled to no relief, including because the agreements required Petitioners to invoke Sections 10.2(a) and (b) in a reasonable time and Petitioner failed to do so.

Prior to any evidentiary hearings, the Parties filed motions requesting dispositive relief. Petitioners argued that in light of the clear language of the Agreements and the undisputed facts, as a matter of law, they were entitled to recover their investment plus IRR. The Respondents argued that the Petitioners' motion should be denied because (1) the Petitioners did not exercise their right to insist on the return of their capital contributions within a reasonable time and the right therefore expired and (2) in any event, Petitioners were estopped from demanding the return of their investments not only because the demand was unreasonably late, but also because it was

inconsistent with Petitioners' agreement to seek permits for plans with a larger square footage and Petitioners' rejecting the Letter of lntent from Namdar Realty Group. The Respondents requested an award dismissing the arbitration or, in the alternative, directing the parties to proceed to the hearing phase of the arbitration.

Eiseman issued a decision on April 26, 2019 denying both parties dispositive relief. That decision agreed with Petitioner's view of the JV Agreements as clearly providing them a right to withdraw from the Project unless conditions precedent were met, but concluded there were issues of fact with regard to estoppel. The decision stated in part:

> At the outset, it is crystal-clear the Agreements provide that the [Petitioners]' invested money subject to two condition subsequent. Simply put, if both tenants did not vacate or the relevant building permits were not timely issued, the [Petitioners] could opt to back-out of the deal. The [Petitioners] correctly note that the Agreements do not contain any time limit for them to exercise their rights (paragraph I 0.2(a) provides that a [Petitioner] may back-out "if and when requested" and "at [its] sole option and discretion" if a condition has not been met). As such, despite the Respondents' request the [sic] I do, I will not impute any time limitation into the Agreements, especially since the Respondents could have insisted that the [Petitioners] exercise their options within a set time period or, if the [Petitioners] refused, decide not to move forward with the deal. I find as unpersuasive the Respondents' assertion that, as a matter of law, the [Petitioners] waited too long (or waited beyond a "reasonable time") to ask for the return of their investments.
> Nonetheless, the affidavits and exhibits submitted by the Respondents raise issues of material fact as to whether, by virtue of their alleged conduct, the [Petitioners] were (or should be), as of December 13, 2017, equitably estopped from exercising their contractual right to recoup their investments. By way of example, as noted above, the Respondents assert that the [Petitioners] opposed (the Respondents actually say "prevented") a potential profitable sale of the property in approximately March 2016. The Respondents also contend that prior to an adverse decision in August 2017 that permitted the remaining tenant to remain in the building, the [Petitioners] embraced an expanded development potential and the filing of new development plans, thereby making it impossible to meet the deadline in the Agreements for securing permits.
> Among other things, in response, the [Petitioners] counter by alleging that (i) the Respondents' argument about a sale "is mere speculation since no offer ever materialized and/or was reduced to a contract;" (ii) it was never a realistic option for them to demand the return of their capital at an earlier date because the Respondents were unable to fund the return of their investments; (iii) this arbitration was commenced before the DHCR denied the Respondents' petition seeking an administrative review of the August 2017 decision; (iv) the Respondents are no longer pursuing the construction of a 14-story

condominium and instead seek merely to renovate the existing four-story building as a rental property; and (v) in any event, the Respondents pleaded with the [Petitioners] to remain "patient" and the [Petitioners] acquiesced without ever waiving any of their contractual rights."

ECF No. 1-8 at 9-10. Four days of evidentiary testimony followed.

On March 4, 2020, Eiseman issued a Partial Final Award declaring the Petitioners "prevailing parties" and awarding them $5,000,000.00 plus the 12% in cumulative annualized return. Therein, Eiseman concluded that "after listening carefully to the testimony at the evidentiary hearings, and reviewing again the exhibits that were introduced into evidence, under the undisputed fact of this case, there is simply no basis to disregard the deal the parties struck and invoke the doctrine of equitable estoppel to prevent the [Petitioners] from exercising their contractually negotiated right to back out of the deal and recoup their investments if the prescribed conditions are not met." *Id.* at 15. He further concluded that "[t]here is nothing in the record to suggest the [Petitioners] misled the Respondents by waiting or delaying to exercise their rights". *Id.* at 16. Rather, he concluded that Petitioners had not waived their right to exercise their Section 10.2 rights. "In their emails, at various times" Petitioners "made it clear that they were seriously considering invoking their rights and, through their own words, clearly, [they] never relinquished their right to do so at a later time." *Id.* at 16. Eiseman also rejected Respondents' estoppel arguments on the grounds that Respondents had not established necessary elements, namely that they were unaware of the true facts and relied on Petitioners' conduct. *Id.* at 17. He also concluded that, based on the unique circumstances of the case, Petitioners had not delayed an unreasonable amount of time to invoke their rights under Section 10.2. *Id.* at 17-18. As to the Namdar deal, Eiseman concluded that "the issue is a red herring" because "[t]he $9 .2 million Letter of Intent was not a firm contract and, in any event, as pointed out by Mr. Yakobovich, it made no economic sense." *Id*. at 20. On the issue of interest, Eiseman rejected an argument by Respondents "that the

6

provisions of the Agreements are 'unenforceable penalty clauses' that cannot be modified". *Id.* at 21. Eiseman concluded instead that " (i) they were freely negotiated by sophisticated parties and they are not penalty clauses and (ii) the [Petitioners'] decision to request 12% (and not the higher IRR percentage) is not a modification of the Agreements; rather, it is the exercise of an election where the Agreements offer two alternatives." *Id.* at 21. The Partial Final Award directed the parties to make further submissions regarding interest and fees.

On June 1, 2020 Eiseman entered a Final Award. Under the Final Award, the Respondents are obligated to pay the Petitioners $8,020,307.22, representing the sum of (i) $5,000,000.00 in damages; (ii) $2,859,371.00 representing the 12% cumulative annualized return rate through May 1, 2020, (iii) $111,576.89 in incurred attorneys' fees as the prevailing party; (iv) $49,359.33 representing the ACC/ICDR administrative fees and expenses to be reimbursed by the Respondents to the Petitioners, and (v) for interest to continue to accrue on the awarded sum [$7,859,371.00] at 12% cumulative annualized return until full payment is made by the Respondents. To date, Respondents have not paid this sum.

Accordingly, on June 24, 2020, Petitioners filed the instant Petition to Confirm the Arbitration Award. On August 17, 2020, Respondents filed a response opposing the Petition to Confirm and cross-moving the Court to vacate the Arbitration Award. Petitioners filed a reply n further support of their petition and in opposition to Respondents' motion to vacate on September 23, 2020. Respondents filed a reply in further support of the motion to vacate on October 7, 2020.

## Applicable Legal Standard

"Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected." *D.H. Blair & Co. v. Gottdiener*,

462 F.3d 95, 110 (2d Cir. 2006) (citations and internal quotations omitted). Judicial review of arbitration awards is "'severely limited,' so as not to frustrate the 'twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co*., 668 F.3d 60, 71-72 (2d Cir. 2012) (citations omitted). The reviewing court owes "strong deference" to "arbitral awards and the arbitral process," *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007), and so a party seeking to vacate an arbitration award "must clear a high hurdle," *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp*., 559 U.S. 662, 671, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010). "It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Id*. (citing *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)). The Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., only allows for vacatur in four circumstances: (1) the arbitral award "was procured by corruption, fraud, or undue means;" (2) "there was evident partiality or corruption in the arbitrators;" (3) "the arbitrators were guilty of misconduct ... by which the rights of any party have been prejudiced;" or (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a).

"The arbitrator's rationale for an award need not be explained, and the award should be confirmed 'if a ground for the arbitrator's decision can be inferred from the facts of the case'. *D.H. Blair*, 462 F.3d at 110 (citing *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 121 (2d Cir. 1991). "Only 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." *Id*. (citing *Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Int'l Union*, 954 F.2d 794, 797 (2d Cir. 1992)). "A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very

high." *Id.* (citing *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997)).

<u>Discussion</u>

Respondents advance several arguments for vacatur of the Arbitration Award. They argue that Eiseman: (1) exceeded his authority in failing to issue a "reasoned award"; (2) exceeded his authority in ruling on the claim under Section 10.2(b), which Petitioners had withdrawn; and (2) manifestly disregarded the law and the Joint Venture Agreement in relation to three issues. For the reasons that follow, the Court concludes that none of arguments clear the high hurdle to vacate the Arbitration Award.

*Arbitrator Did Not Exceed Authority by Failing to Issue Reasoned Decision*

Respondents first argue that the Court should vacate the Arbitration Award because Eiseman exceeded his authority by not issuing a reasoned award. It is undisputed that Eiseman was required to do so.

The Second Circuit has held that "an arbitration award is a reasoned award when it contains a substantive discussion of the panel's rationale". *Leeward Constr. Co. v. Am. Univ. of Antigua - Coll. of Med.*, 826 F.3d 634, 636 (2d Cir. 2016). It must "set[] forth the basic reasoning of the arbitral panel on the central issue or issues raised before it" but it "need not delve into every argument made by the parties." *Id.* at 640. Respondents' main argument is that the Arbitration Award fails to discuss their arguments that Petitioners are estopped from demanding the return of their investment based on the failure to timely secure permits because Petitioners embraced an

expanded development plan that made it impossible to meet the deadline.[3] To the contrary, Eiseman considered and rejected that argument. He concluded that "there is no evidence that, as a condition of re-filing plans for the larger footprint or in continuing to allow the Respondents additional time to evict the rent stabilized tenant, the [Petitioners] waived their contractual rights". ECF No. 1-8 at 18. He also concluded that Respondents' estoppel argument was insufficient because they failed to show that they were unaware of true facts or relied on the Petitioners' representations. The discussion on this topic is  more than sufficient for a reasoned decision.

Respondents also briefly argue that the Arbitration Award was not reasoned because it did not address whether Petitioners' declining to consent to a sale of the property is grounds for estoppel. However, the Arbitration Award specifically addressed that argument, and rejected it. ECF No. 1-8 at 20 ("Respondents also urge that the [Petitioners'] rejection of Namdar Realty Group's Letter of Intent meant that they were 'all-in' and waived their right to back out. The record does not support that view and, candidly, the issue is a red herring. The $9.2 million Letter of Intent was not a firm contract and, in any event, as pointed out by Mr. Yakobovich, it made no economic sense.").

Because Eiseman addressed both issues Respondents contend he did not, the Court rejects the argument that the Arbitration Award is not reasoned. Correspondingly, the Court concludes that Eiseman did not exceed his authority on this grounds.

*Arbitrator Did Not Exceed Authority by Deciding Withdrawn Claim*

---

[3] Respondents also take issue with the Arbitration Award considering whether Petitioners' delay in invoking Section 10.2 is grounds for estoppel, which argument Respondents say they did not advance. Petitioners do not explain how the inclusion of this estoppel argument would render the Arbitration Award unreasoned. The Court concludes it does not.

Respondents next argue that Eiseman exceeded his authority by ruling on the Section 10.2 (b) argument, related to the failure to remove the rent-stabilized tenant, which Respondents claim Petitioners withdrew. The argument seems to be that Petitioners' election to seek to recover 12% interest rather than IRR operated to abandon the claim arising from the failure to remove the rent stabilized tenant (Section 10.2(b)), which clause entitles Petitioners to IRR, in favor of the claim related to the permits (Section 10.2(a)), which provides for a 12% recovery. This argument is unavailing for at least two reasons. *First*, there is nothing indicating that Petitioners intended to abandon their claim based on Respondents' failure to remove the rent-subsidized tenant besides Respondents' say so. *Second*, Eiseman considered this issue and concluded that Petitioners were entitled to recover under either 10.2(a) or 10.2(b) and were free to elect to pursue one interest rate over the other. Respondents put forth no basis for this Court to second guess Eiseman's determination. Accordingly, the Court finds no exceeded authority here.

*Arbitration Award Not in Manifest Disregard of the Law*

In addition to the four statutory bases for vacatur, the Second Circuit has held that "[a]n arbitration award may be vacated if it exhibits a 'manifest disregard of the law'." *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002) (citing *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997)). Review under the manifest disregard standard is "'highly deferential' to the arbitrators, and relief on such a claim is therefore 'rare.' *STMicroelectronics, N. V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011) (citing *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007). A court can vacate an arbitral award for manifest disregard of the law only if (1) "the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," and, (2) "the arbitrator knew about the existence of a clearly governing legal principle but decided to ignore

it or pay no attention to it." *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011) (internal quotations and citations  omitted).

Respondents argue that the Arbitration Award shows manifest disregard of the law in three ways: (1) by misapplying the law regarding contract terms with no definite duration specified; (2) by finding valid an illegal penalty clause; and (3) by failing to require Petitioners to relinquish their interest in the Project. Each argument is without merit.

With respect to contracts with no definite duration, the caselaw Respondents cite does not indicate defined, explicit, and clearly applicable law the arbitrator ignored. Respondents rely on two types of cases. *First*, they cite cases about contracts where there is no definite duration of performance. [4] The issue in these cases is when the contractual relationship terminates. The rules that come from these cases are not clearly applicable here, where the question was how soon after the triggering events Petitioners had to demand the return of their capital.

*Second*, Respondents cite *Zev v. Merman*, 73 N.Y.2d 781 (1988), and cases that follow it[5]. *Zev* is a memorandum opinion that holds that "[w]hat constitutes a reasonable time for

---

[4] *See e.g., Few Spirits, LLC v. UB Distribs., LLC*, 2020 NY Slip Op 30265(U), ¶¶ 6-7 (Sup. Ct.) ("Where a contract contains no definite term of duration, it is considered terminable at will. A definite term of duration need not be expressly stated but may be implied. Where there is no definite term of duration, it will not be implied that the contract is perpetual in duration.") (citations omitted); *Bennett v. Atomic Prods . Corp.*, 2015 NY Slip Op 07806, ¶ 2, 132 A.D.3d 928, 929-30, 18 N.Y.S.3d 443, 445 (App. Div. 2nd Dept.) ("In the absence of an express term fixing the duration of a contract, the courts may inquire into the  intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent".); *Better Living Now, Inc. v. Image Too, Inc.*, 2009 NY Slip Op 8769, ¶ 2, 67 A.D.3d 940, 941, 889 N.Y.S.2d 653, 655 (App. Div. 2nd Dept.) ("Contracts containing no definite term of duration are terminable at will. Unless a contract expressly provides for perpetual performance, the 'law will not imply that a contract calling for continuing performance is perpetual in duration. Moreover, '[i]n the absence of an express term fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent'") (citations omitted).

[5] *See e.g., Breslin v. Frankel*, 167 A.D.3d 692, 90 N.Y.S.3d 99 (2 Dept. 2018); *Sterngass v. Maisel*, 133 A.D.2d 450, 519 N.Y.S.2d 569 (2 Dept. 1987); *Modern Pool Prods., Inc. v. Rudel Mach. Co.*, 58 Misc. 2d 83, 85 (Civ. Ct. 1968) ("It is fundamental that an offer, if not accepted promptly, may be terminated by lapse of time (Restatement, Law of Contracts, § 35). Where no time is fixed in the offer within which acceptance must be made, it is a rule of law that acceptance must be made within a reasonable time (Restatement, *supra*, § 40, subd. [1]).); *Maier v. Rebstock*, 92

performance depends upon the facts and circumstances of the particular case" and "[t]he determination of reasonableness must by its very nature be determined on a case-by-case basis." *Id*. But, the Court does not see how Eiseman could be said to have ignored this caselaw when he engaged in a fact intensive inquiry regarding the parties intentions and actions related to Section 10.2, citing *Zev*. *See* ECF No. 1-8 at 17-18. For these reasons, Respondents' first argument for manifest disregard of the law fails.

Respondents also argue that the Arbitration Award manifestly disregarded the law by failing to invalidate Section 10.2 as an unenforceable penalty clause. It is not clear whether Respondents refer to the 12% interest rate or IRR. Eiseman directly addressed this point in his award, stating that the JV Agreements offered Petitioners two alternatives for recovery—12% or IRR of 30.5%—and there was nothing wrong with Petitioners electing to recover 12% interest. ECF No. 10-8 at 21. Eiseman further reasoned that 12% was not a penalty rate because it was freely negotiated by sophisticated parties and is in line with accepted interest rates, such as those charged by credit card companies and interest awarded on judgments in New York. Respondents present no law that prohibits Petitioners from relying on the 12% interest rate in Section 10.2(a), rather than the 30.5% IRR in Section 10.2(b), nor that indicates that a clause awarding 12% interest is a penalty clause. Accordingly, Respondents fails to show any well-defined, explicit, and clearly applicable governing law that the arbitrator ignored. They therefore fail to show manifest disregard of the law.

Finally, Respondents contend that the Arbitration Award was in manifest disregard of the law by failing to require Petitioners to relinquish their interest in the Project. Respondents cite the

---

A.D. 587, 87 N.Y.S. 85 (4 Dept. 1904). Respondents also cite several non-New York cases whose holdings are not "clearly applicable" to the instant matter, and which the Court will not discuss further.

JV Agreement's requirement that if Petitioners are bought out—they have not yet been, Petitioners must then relinquish their stake in the Project. Respondents cite no law requiring the Arbitration Award to anticipatorily direct Petitioners to relinquish their interest, nor, if such authority exists, that the arbitrator knew about it. Accordingly, this argument fails as well.

<u>Conclusion</u>

The Court has concluded that each of the arguments advanced by Respondents in favor of vacatur of the Award lacks merit. Accordingly, the Court DENIES the Motion to Vacate the Arbitration Award and hereby CONFIRMS the Arbitration Award. The Clerk of Court is respectfully directed to enter judgment in favor of Petitioners Hagshama Manhattan 10 Gold, LLC, Hagshama Manhattan 10 Platinum, LLC and Co Fund 1, LLC, with addresses of 11 Granit Street, Petach Tikva, Israel, jointly and severally, and against the Respondents Cheskel Strulovitz, 940 First Avenue, LLC, And First Avenue Realty Holdings, L.P., jointly and severally, with addresses c/o CS Realty, 116 Nostrand Avenue, Brooklyn, NY, in the amount of $8,020,307.22. The Clerk of Court is further directed to terminate the motion at ECF No. 10 and close this matter.

**SO ORDERED.**
**Dated: March 28, 2021**
       **New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**